*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMAR TERRELLE PURDLE,

        Defendant-Appellant.

FOR PUBLICATION
February 22, 2024
9:05 a.m.

No. 353821
Kent Circuit Court
LC No. 19-003606-FC

ON REMAND

Before: CAMERON, P.J., and M. J. KELLY and SHAPIRO, JJ.

M. J. KELLY, J.

This case returns to us on remand from our Supreme Court. *People v Purdle*, 997 NW2d 215 (2023). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS AND PROCEDURAL BACKGROUND

Defendant, Jamar Purdle, was convicted of second-degree murder, MCL 750.317, carrying a concealed weapon, MCL 750.227, felon in possession of a firearm, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The basic facts underlying his convictions are set forth in our prior opinion:

> On March 31, 2019, Mikeya Day was shot dead. The prosecution presented evidence that prior to Day's death, she and Purdle travelled to a residence on Hancock Street in Grand Rapids. Day's uncle called her while Purdle was outside the vehicle, and Day asked him to "hold" just before Purdle returned. As a result, he was on the line when Day was shot. He testified that Day and Purdle got into an argument over drugs and money. During the argument, Day demanded that Purdle give her money and drugs and that he leave the vehicle. Purdle refused. As the argument escalated, Day's uncle heard a struggle followed by Day saying, "You ain't going to do me like that." He stated that it sounded like the phone was dropped, and, after that he overheard Purdle say "Fuck you" just before he heard a loud noise. Later, he learned that the noise had been a gunshot.

Surveillance footage from a nearby residence showed Day exiting the driver's side door and staggering across the street. Purdle got out of the front passenger side door at the same time. He reached back into the vehicle as if to pick something up and then walked out of view of the camera. Takeah Hill, a resident of one of the houses, testified that Purdle had been at her home approximately eight minutes before the shooting. She stated that he returned, banged on the door, and told her that Day had shot herself. The surveillance footage shows Purdle returning to usher Day, who appears to be covered in blood from her neck to her waist, back into the vehicle. When Day exited the vehicle again, Purdle put her back inside and then drove away.

Day's uncle recalled that after hearing the gunshot, it was quiet for two or three minutes and then he heard the doors slam a couple of times. He heard Day say that she thought she was dying and that she could not [breathe]. Purdle told her she was not going to die. He also said, "Tell them that we got robbed, we got robbed," three or four times. Day's uncle heard sounds of traffic, so he surmised that they were driving to a hospital. He stated that he yelled, but no one responded to him so he eventually hung up and called hospitals in the area to find where Day had been taken.

Purdle brought Day into the emergency department. He told a nurse that Day had been shot and suggested that he might have also been shot. The nurse examined Purdle and determined that he had not been shot. She stated that, over approximately 30 minutes, Purdle made a number of statements regarding the shooting. First, he explained that he and Day were in a car preparing to purchase marijuana when the person they were going to purchase the marijuana from attempted to rob them. Purdle said that he tried to push the gun away, but it went off. The second time Purdle explained what happened, he stated that he was outside the vehicle and tried to push the gun away when it went off. In his third version, Purdle said that the gun discharged while he "tussled" with a person who was trying to sell him a gun.

In the meantime, a police sergeant investigating the shooting was informed that a bullet had entered Day's right cheek and exited the left side of her throat. Determining that the shot could have been fired while Purdle was sitting in the passenger seat, the sergeant went to speak to another officer, who was talking to Purdle in a small room. While they were discussing things outside the room, Purdle fled. He was located in the stairwell, "frantically pulling on the [locked] doors" to other floors. After his arrest, Purdle told the police that he and Day were attempting to sell a gun to a person near downtown Grand Rapids, and the gun accidentally went off when Purdle handed it to the person through the passenger side window. When the detectives suggested that the gun was in Purdle's hand when it was fired, Purdle insisted that it was in the hand of the unknown third person. When the detectives suggested that Purdle shot Day and that there was an argument in the car, Purdle denied that there was an argument. Purdle did not tell the detectives what happened to the gun, and the gun was never recovered.

At trial, Purdle testified that Day attempted to rob him at gunpoint. He stated that he handed her drugs and when she demanded his phone, he dropped it in an attempt to distract her so he could escape. When she demanded his diamond-studded sunglasses, he went to remove them from his neck and Day lurched her body away from him. He testified that in the process the gun when off and Day accidentally shot herself. Believing he had been shot, he got out of the vehicle and then reached back in to get a liquor bottle. He testified that when he saw the blood in the driver's seat, he realized that Day had shot herself. Purdle recounted that once he realized Day had shot herself, he got her back into the vehicle so he could take her to the hospital. He stated that while they were heading to the hospital, Day threw what sounded like a gun and some drugs out of the window and then she concocted a plan to tell people that she had been shot when some other third person tried to rob them. [*People v Purdle*, unpublished per curiam opinion of the Court of Appeals, issued February 1, 2022 (Docket No. 353821), pp 1-3.]

Purdle was sentenced as a fourth-offense habitual offender, MCL 769.12. After consideration of the advisory sentencing guidelines, the trial court determined that Purdle's minimum sentencing guidelines range for the second-degree murder conviction was 315 to 1050 months.[1] The court imposed a within-guidelines sentence of 680 to 960 months' incarceration for the second-degree murder conviction. Purdle appealed his convictions and sentence to this Court. In relevant part, he argued that he was entitled to resentencing because his 680-month minimum sentence was not proportionate to the circumstances surrounding the offense and the offender because the sentence amounted to a de facto life sentence. We held that, under MCL 769.34(10),[2] review of his proportionality challenge was precluded because his minimum sentence was within the guidelines range, there was no error in the scoring of the guidelines, and the trial court did not rely upon inaccurate information when determining his sentence. *Purdle*, unpub op at 6.

Our Supreme Court subsequently addressed the constitutionality of MCL 769.34(10) in *People v Posey*, 512 Mich 317, 326; ___ NW2d ___ (2023) (Docket No. 162373) (lead opinion by

---

[1] Second-degree murder is listed as a Class M2 felony with a maximum sentence of life imprisonment. See MCL 777.16p. The trial court assessed 100 points for Purdle's prior record variable (PRV) score, which means that he was scored at PRV Level F. See MCL 777.61. The court assessed 90 points for Purdle's offense variable (OV) score, which meant that he was scored at OV Level II. See MCL 777.61. A defendant who scores at PRV Level F and OV Level II for a Class M2 crime has a minimum sentencing guidelines range of 315 to 525 months' imprisonment. MCL 777.61. However, because Purdle was also a fourth-offense habitual offender, the upper limit of his minimum sentencing guidelines range was increased by 100%. MCL 777.21(3)(c). Therefore, Purdle's minimum sentencing guidelines range was 315 to 1050 months' imprisonment. Purdle has not challenged the scoring of the PRVs or OVs, nor has he disputed that he is a fourth-offense habitual offender.

[2] The first sentence of MCL 769.34(10) provides that "[i]f a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence."

BOLDEN, J., joined by BERNSTEIN, J.); slip op at 3-5, (CAVANAGH, J., concurring in part and concurring in the judgment); slip op at 2, and (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment); slip op at 1. As recognized by this Court in *People v Posey (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 345491); slip op at 2:

> Supreme Court Justices BOLDEN, BERNSTEIN, CAVANAGH, and WELCH agreed that the opening sentence of MCL 769.34(10) is unconstitutional, although Justice WELCH offered a different constitutional analysis. *Posey*, 512 Mich at 351-352 (opinion by BOLDEN, J.); *id*. at 361 (CAVANAGH, J., concurring in part and concurring in the judgment); *id*. at 390-391 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment). [Quoted citations updated to reflect the pagination in the advance sheet.]

Notwithstanding that no majority consensus ever formed in the Supreme Court as to *why* the first sentence of MCL 769.34(10) is unconstitutional, the Supreme Court vacated our determination that MCL 769.34(10) precluded us from reviewing whether Purdle's within-guidelines sentence was proportionate and remanded to this Court "for reconsideration in light of *Posey*." See *Purdle*, 997 NW2d at 215.

## II. PRECEDENTIAL EFFECT OF *POSEY*

It can be argued that our Supreme Court's decision in *Posey* is not technically binding because it is only a plurality opinion in which the majority of the justices were unable to concur on the exact reasoning for the holding, see, e.g., *People v Scarborough*, 189 Mich App 341, 344; 471 NW2d 567 (1991) ("Technically, the *Schultz* holding is not binding on this Court. It is a plurality opinion in which a majority of the justices failed to concur on the exact reasoning for the holding."); accord *People v Jackson*, 390 Mich 621, 627; 212 NW2d 918 (1973) ("Since neither opinion obtained four signatures, neither is binding under the doctrine of Stare decisis."). In *Scarborough*, this Court concluded that, although the Supreme Court's plurality opinion was not technically binding, it was prudent to follow the holding in the interest of judicial economy. *Scarborough*, 189 Mich App at 344. The Court reasoned:

> Four justices of the Supreme Court there addressed the issue now under consideration and concluded that the amendments to the act should be applied retroactively. Their reasonings were, if not the same, at least very similar. It would be wasteful of judicial resources to disregard *Schultz*. Defendant and those similarly situated to him would surely receive the benefit of sentencing under the amendments to the act upon appeal to the Supreme Court. Moreover, we are persuaded that the holding of the *Schultz* decision was correct. [*Id*.]

Like the *Scarborough* Court, in the interest of judicial economy and jurisprudential stability, we will apply the essential holdings upon which the *Posey* plurality agreed to the instant case.

# III. PROPORTIONALITY

## A. STANDARD OF REVIEW

As explained above, Purdle argues that he is entitled to resentencing because his 680-month minimum sentence was not proportionate to the circumstances surrounding the offense and the offender. "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). The sentencing court abuses its discretion if the sentence imposed is disproportionate to the seriousness of the circumstances involving the offense and the offender. *Id*. at 460.

## B. ANALYSIS

With regard to a within-guidelines sentence, "there is a nonbinding presumption of proportionality." *Posey (On Remand)*, ___ Mich App at ___; slip op at 2. And, although a within-guidelines sentence may be disproportionate or unreasonable, "the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Id*. Moreover, as explained in *Posey (On Remand)*:

> "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). With respect to sentencing and the guidelines, the key test is not whether a sentence departs from or adheres to the guidelines range. *Steanhouse*, 500 Mich at 472. The key test is whether the sentence is proportionate to the seriousness of the matter. *Id*. In regard to proportionality, the *Milbourn* Court "observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system." *Milbourn*, 435 Mich at 668. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003). [*Id*. at ___; slip op at 2-3.]

On appeal, Purdle does not dispute the seriousness of the offense, nor does he address considerations related to the sentencing goals of reformation of the offender, protection of society, discipline of the offender, and deterrence of others from committing the same offense. Rather, he focuses only one circumstance related to himself. Specifically, he notes that his current parole eligibility date is November 29, 2077, which means that he will be 89 years old before he is eligible for parole. He contends that his minimum sentence is the equivalent of a death sentence when considered in light of the life expectancy of African American men, both in general and in Michigan prisons. Purdle did not, however, receive a death sentence, nor was he sentenced to life in prison. Rather, he received a term of years sentence. The seriousness of his offense is not lessened by Purdle's age and race when he was sentenced for murdering Day. Indeed, a

defendant's age is insufficient to overcome the presumption of proportionality, especially when considered in light of a defendant's criminal record and the gravity of his offenses. *People v Bowling*, 299 Mich App 552, 558-559; 830 NW2d 800 (2013).

Here, Purdle had a lengthy criminal history.[3] Indeed, he does not dispute that he is a fourth-offense habitual offender, which is a fact that significantly increased his minimum guidelines range under the advisory sentencing guidelines.[4] Moreover, as demonstrated by the properly-admitted other-acts evidence,[5] Purdle's action of shooting Day dead following an argument was not the first time that Purdle pulled a gun on a woman he was dating in response to an argument. Indeed, a few days earlier, in response to an argument, he frightened another woman he was dating by displaying a gun in response to an argument. Given Purdle's history, we conclude that he has demonstrated "an unwillingness to obey the law after prior encounters with the criminal justice system" and that in light of his recidivism a greater punishment is reasonable. See *Posey (On remand)*, ___ Mich App at ___; slip op at 2-3.

Furthermore, we are unpersuaded that consideration of Purdle's age and race at the time of the offense would serve the goals of sentencing. See *People v Sabin*, 242 Mich App 656, 661-662; 620 NW2d 19 (2000) (quotation marks and citations omitted) (stating that "the factors considered in imposing sentence should be balanced with the following objectives: (1) reformation of the offender, (2) protection of society, (3) punishment of the offender, and (4) deterrence of others from committing like offenses.").

Moreover, the seriousness of the offense is significantly egregious and cannot be understated. In response to an argument regarding drugs, Purdle pulled a gun on Day, a woman whom he was dating. And, although he had done a similar thing to a different woman he was dating just days earlier, this time, he escalated his behavior by shooting Day in the face. When she twice left the vehicle, he put her back inside. While she was dying, he did not comfort her. Instead, he told her to lie and say that they had been robbed. Before and after her death, he attempted to shift blame for the shooting from himself to Day, stating multiple times (albeit in different ways) that she had attempted to rob him and that she was responsible for disposing of the gun used to kill her.

---

[3] According to the presentence report, at the time of sentencing Purdle had six juvenile adjudications, and he had more than 25 adult convictions. He was previously given the opportunity of probation, both in district court and in circuit court, but he repeatedly violated. At one point, he was sentenced to a special alternative incarceration (SAI) program for an unarmed robbery conviction, but he absconded from that program and had to serve time in prison.

[4] See note 1, *supra*.

[5] In our prior opinion, we determined that the trial court did not err by admitting this other-acts evidence under MCL 768.27b(1) and by not excluding it under MRE 403's balancing test. *Purdle*, unpub op at 3-4. The Supreme Court did not vacate that potion of our opinion. See *Purdle*, 997 NW2d at 215.

In light of the seriousness of the offense and Purdle's criminal history, we conclude that his age and race at the time of sentencing does not render his within-guidelines sentence disproportionate. Nor is such an argument sufficient to overcome the presumption that his within-guidelines sentence is proportionate.

Affirmed.

/s/ Michael J. Kelly
/s/ Thomas C. Cameron